IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NIFTY HOME PRODUCTS, INC.,

Plaintiff,

v.

LADYNANA US, ET AL.,

Defendants.

22cv0994
ELECTRONICALLY FILED

**Memorandum Opinion - Findings of Facts and Conclusions of Law on Damages**

This is an action for willful copyright infringement under federal copyright law, and injunctive relief under the All Writs Act, one of a series of related cases before this Court, against numerous Defendants, the vast majority of which are Chinese corporations, who have been found by this Court to have engaged in infringing the "BACON BIN" kitchen product for storing and disposing of bacon grease. The BACON BIN was trademarked by original Plaintiff, Talisman Designs, LLC in related cases, and the brand family of Talisman Designs was acquired by current Plaintiff, Nifty Home Products, Inc. Doc. 1. (See also, related cases, 20-cv-1084, 21-cv-121, 21-cv-777).

The uncontroverted factual allegations of this case (and related litigation) reveal that Defendants willfully infringed and sold "knock-off" products on internet-based marketplaces, AliExpess.com, Amazon.com, eBay.com, Walmart.com and Wish.com, among others, targeting consumers nationwide, including within the Western District of Pennsylvania, in violation of federal copyright (and trademark) laws.

On April 22, 2026, this Court issued a Memorandum Opinion and related Order granting the Renewed Motion for Default Judgment on liability, and Motion for Permanent Injunction

(doc. 236, doc. 237), leaving open the final ruling on the Motion for Permanent Injunction pending a determination on damages after the Court set up an orderly process for submission of prehearing exhibits and witness proffers. Therefore, currently pending before this Court in this seemingly endless litigation process is a determination on the issue of damages on a default judgment/permanent injunction entered by this Court.

Years ago, this Court entered default and a default judgment against all remaining Defendants, and after two groups of Defendants appealed, the case was returned to this Court subsequent to a ruling by the United States Court of Appeals vacating the default judgments in this case, and with certain instructions for issues of consideration upon remand.

At the outset, the Court would like to emphasize a critical detail that was addressed at length in the initial case management conference on May 30, 2025, upon remand, and Defendants now seem to be rehashing that argument yet again, by stating that the Court ruled only by text order at doc. 153, which is untrue (doc. 169). The Court also ruled on the record at the initial case management conference (doc. 169). Indeed, the subject of whether the default or merely the default judgment was lifted by Court of Appeals for the Third Circuit has been an area of consideration. To that end, the Court heard lengthy oral argument by all parties on May 30, 2025, and ultimately concluded that the case remains at the default phase. Most critically to the issue here, because none of the parties sought for the default to be lifted in their appeals before the United States Court of Appeals for the Third Circuit, that issue was waived by the parties, and was not before this Court upon remand. As a practical matter, however, because the Court ordered the parties to engage in jurisdictional discovery, the issue of whether to lift the default was still arguably before this Court upon remand since the standard for lifting a default under Fed. R. Civ. P. 55(c) and a default judgment under Fed. R. Civ. P. 60(b), is similar.

This Court has strived, as it does in all cases upon remand, to explicitly follow the instructions of the United States Court of Appeals and upon return of the mandate, the Court timely had a status conference at which a period of jurisdictional discovery was scheduled along with numerous other case management deadlines (doc. 163).

The Court expected the parties to engage in the orderly process set forth in the case management order, to obtain necessary discovery in order to determine the issue of jurisdiction regarding sales and to entertain motions to dismiss or for summary judgment on that basis. The Court is dismayed that, over a year and a half later, it has become clear that those scheduled endeavors amounted to little more than litigation tactics, missed deadlines, repeated withdrawals and changes of counsel, and more delays, including the filing of numerous (at least five) motions to reconsider.

To the Court's knowledge, the parties have not fulfilled their discovery obligations, but alas, no motions to compel (timely or otherwise) have been filed. The Court gave Defendants more than ample time to develop their jurisdictional defense. After having been a member of this Court for almost 24 years, and seldom if ever having seen a case play out so oddly, the Court surmises that Defendants chose not to pursue their possible meritorious defense and instead, all parties muddled the record with countless meritless motions and delay tactics.

On March 30, 2026, Defendants, having never fully availed themselves of the discovery period or having filed any motions to compel discovery, Plaintiff filed a renewed Motion for Default Judgment (doc. 223). On April 22, 2026, the Court issued its Memorandum Opinion and Order thereon, ruling that the Motion to Dismiss for Lack of Prosecution is denied, the Motion for Return of Property is denied, the Motion for Default Judgment is granted, and the Court deferred a ruling on the Motion for Permanent Injunction as to Damages (doc. 236, doc. 237).

The Court set a hearing for live testimony on damages and further litigation tactics continued, during that time, including that Defendants belatedly filed Motions not to attend the conference citing inability getting the necessary travel documents to travel from China. The Court granted the request to be excused primarily because Plaintiff took no oppositional position thereon, and because the Court did not wish to continue to delay this matter any further (the case now being four years old), because, after all, "justice delayed is justice denied."

The Court then rescheduled the hearing on damages for July 21, 2026, and also set forth filing deadlines for witness proffers and exhibit lists (doc. 247). Upon the eve of that hearing, the Court received a "motion for instructions" from Defendants on July 17, 2026, stating that Defendants were unable to defend themselves on the issue of damages. The Court issued the following ruling, which bears repeating:

> This case, more than any on this Court's current or recent docket, feels like a repeat of the "greatest hits" tunes on a record player. Just as the album is about to end, one or more of the attorneys picks up the needle and moves it back to the start. Since 2022, the Court has attempted to move this case forward in an expeditious and timely manner, and to let the record play out. To that end, the Court has repeatedly sought the input of the parties to do so. Yet, the same tune continues to play. Plaintiff's counsel fails to file whatever the Court has ordered in a timely manner, and Defendants then ask the Court to dismiss the case. Neither side seems to be focused on the merits, or the conclusion of this action. Instead, this case has been wrought with delays, dilatory actions, gamesmanship, motions to reconsider, and random motions such as the present Motion seeking for the Court to "instruct" Moving Defendants on what to do.
>
> On July 6, 2026, in order to help this Court prepare the upcoming damages hearing, Plaintiff was ordered to coordinate and file a Joint Status Report identifying the exhibits and witnesses for the damages hearing

scheduled for July 21, 2026. The filing was due on July 16, 2026.

Specifically, the Text Order stated as follows:

STATUS REPORT ORDER. Plaintiff and Defendants shall file a joint status report setting forth witnesses by name, title, and affiliation, detailed offers of proof for each witness, and anticipated length of testimony, and exhibits (any objections and responses thereto) for upcoming damages hearing. Said report has been ordered already and numerous parties did not submit it. Instead, the parties continue with motions practice while ignoring Court orders. Plaintiff shall have the responsibility for filing said document and it is due by 7-16-26. The hearing date on damages of 7-21-26 is FIRM. Signed by Judge Arthur J. Schwab on 7-6-26. Doc. 267.

Plaintiff failed to file the Joint Status Report in a timely manner, and instead of professionally reaching out to Plaintiff to coordinate said filing or alternatively filing their own documents, Moving Defendants now have filed the Instant Motion claiming that they cannot be expected to defend themselves again damages. The alleged statutory damages that have been known to the parties for many months.

The Court is now in receipt of the Status Report, filed belatedly on July 18, 2026 (2 days late). As evidence of the gamesmanship that is continuing, Defendants have failed to cooperate and also did not file their own status report setting forth their witnesses or exhibits to refute the statutory damages request of Plaintiff as clearly outlined in Plaintiff's Motion at Doc. 223.

Apparently, Plaintiff has failed to comply with discovery deadlines and is overdue on responses to Defendants. Inexplicably, instead of ever filing a Motion to Compel Discovery, which would be the normal course of action, Defendants have filed numerous Motion(s) to Dismiss for failure to prosecute the case.

The Court is befuddled as to why a Motion to Compel has not been filed. And yet, Plaintiff's counsel, for his part, admits in each responsive document that "some dates may have slipped." The Court wholeheartedly agrees with the sentiment that "some dates have slipped." On the other hand, Defendants

have spent years filing motions, such as the present motion, which seem more focused on a "gotcha" moment, instead of attempting to move this case to conclusion.

Ultimately, Plaintiff's counsel has responded to all of those motions professionally and competently, albeit sometimes tardily. The Court cannot go so far as to say there has been a failure to prosecute, that would warrant a dismissal of the case outright. In fact, there are over 265 docket entries to date and Plaintiff has responded to all of Defendants' filings.

Now, a few short days before the damages hearing, the Court has ordered a response to Defendant's latest Motion for "Instructions," regarding the-then unfiled Joint Status Report, and as has become the routine, the Court has received a (timely) response from Plaintiff and declaration from Plaintiff's counsel explaining again that he was out of the office, that this was an inadvertent oversight, and apologizes for the delay, but also noting that the Moving Defendants have failed to provide their response to Plaintiff's proposed witnesses and exhibits. The Status Report was filed belatedly but is complete and provides no input from Defendants. The Court is uncertain why Defense counsel feels that Plaintiff's counsel should be punished for not filing his documents in a timely manner, but Defense counsel bears no responsibility to the Court for likewise complying with Orders of Court, or acting professionally.

Defendants have filed the instant vague Motion with no real requested relief. (Doc. 268-1 "The Court has reviewed the motion and is otherwise duly advised. Accordingly, it is hereby ORDERED AND ADJUDGED as follows: []"). A renewed Motion to Dismiss for failure to prosecute and a Motion to Reconsider are also currently pending before this Court.

Despite the unusual motions practice and conduct of all counsel, the Court will hold the damages hearing on July 21, 2026, as promised. To the extent Defendants contend that they are unprepared for said hearing, the Court

does not agree or finds that Defendants bear their own responsibility for preparing for a hearing.

For its own purposes, the Court notes that Plaintiff's prior filings have sought statutory damages in the amount of $150,000.00 per infringement for a total of $600,000.00 per infringing Defendant. The Court is unclear regarding which of the remaining Defendants Plaintiff seeks damages against at this juncture and seeks a clear understanding of the total amount of damages sought by Plaintiff. The Court is also unclear exactly how much money was put into escrow, and it may be buried in some filing, but the Court is unable to readily glean that information.

However, the Court finds that the record in this case does not support a finding that Defendants are unable to defend themselves at this juncture on damages, based upon a filing that is two days late. Again, a properly and timely filed Motion to Compel pursuant to Fed. R. Civ. P. 26 and/or 37, would have been the appropriate mechanism to challenge Plaintiff's damages assessment. That time is not now.

It is not the prerogative of the Court to tell the parties how to handle their case. It is the job of the Court to dispense with its duties pursuant to Fed. R. Civ. P. 1, and to attempt to provide all parties, in this case, and in every case, with a fair, just, efficient and streamlined judicial process in order to timely, and cost effectively resolve disputes before it. The actions and inactions of counsel and the continual "gotcha" motions practice, and delays have made that task nearly impossible.[1]

[1] For example, Moving Defendants did not wish to attend said damages hearing, yet delayed over two months after the Court set the damages hearing, and then claimed it was too late to receive a visa for them to travel from China. See Doc. 238 and Doc. 263. These are now the same Defendants who claim that it would be unfair to require their counsel to come to a hearing at which they are not prepared to defend themselves. They are not prepared, frankly, because they did not move to compel the documents that were needed in order to do so.

> For these reasons, Moving Defendants' Motion for Instructions (Doc. 268) is DENIED. At the damages hearing, the Court will be pleased to hear the evidence and testimony of the parties and witnesses and any cross examination thereof. Until then, it appears that the record will continue to play out. Finally, the Court will also consider any proper Motions for Sanctions pursuant to Fed. R. Civ. P. 11. Any Motions filed pursuant to Fed. R. Civ. P. 26 and 37 are denied as untimely.

Doc. 272.

Then, on the morning of the scheduled July 21, 2026 hearing, a Motion in Limine was filed, containing an incorrectly titled proposed order and the relief requested was that: "All evidence beyond that for the minimum statutory damages amount is hereby excluded." (doc. 275-5). Of course, no evidence other than the issue of statutory damages was before this Court at that time, so that motion was denied as untimely and moot, and the Court did so "live" on the record at the hearing of this matter on July 21, 2026. The purpose of the damages hearing was to determine statutory damages only (doc. 280), and the transcript thereon includes certain rulings and statements of the Court, including on the last minute Motion in Limine, which the Court incorporates herein. Counsel for the parties attended the hearing, but only Plaintiff submitted live testimony at the hearing.

Both prior to and since that hearing, Defendants have filed at least two notices of appeal to the Court of Appeals for the Third Circuit, but these appeals do not divest this Court of the ability to determine damages and to make a final ruling on the permanent injunction (see doc. 261- Order staying appeal pending post-decision motion, and doc. 281 – Order reinstating appeal). Proposed Findings of Fact and Conclusions of Law have been filed (doc. 282, doc. 283 and doc. 284), and now another pending

Motion to Reconsider the Court's prior ruling denying the Motion in Limine (doc. 285), and response in opposition (doc. 289) is also pending.[2]

## II. Findings of Facts

Nifty is the owner of the intellectual property and sells a bacon grease container called the Bacon Bin. Its distinctive pig face is the subject of U.S. Copyright Registration VA 2-218-985. Plaintiff, Nifty (who has since been acquired by Talisman Designs), also owns U.S. Copyright Registration No. VA 2-214-107, a group registration covering photographs of the product. Three particular product photographs were used in Defendants' advertising in addition to the pig-face sculpture in the competing goods.

The Court finds that Defendants willfully infringed the product (see accompanying Order on Permanent Injunction). There are currently 32 Defendants remaining in this civil action and default remains against all of them (doc. 153).

Nicolas Rose, Nifty's general manager, testified at the hearing the myriad ways the online infringements by Defendant has affected its business. Nifty has been forced to spend employee time monitoring listings and seeking removal of unauthorized

[2] Simply because Moving Defendants are displeased with a ruling of the Court, does not give the Court a reason to grant reconsideration. Moving Defendants latest Motion to Reconsider is based upon its belief that the Court should now allow discovery to be reopened, and presumably a whole new damages and jurisdictional phase. The Court set forth its reasons on the record for why that will not occur. Defendants cannot sit on their hands, and then complain on the literal morning of the damages hearing that Plaintiff did not properly produce something to which they were entitled. Again, no motion to compel was ever filed. In any event, as Plaintiff emphasizes and this Court agrees, although the original motion in limine and the Motion are extremely vague about the precise nature of Nifty's alleged discovery transgressions, if the Moving Defendants were relying on Nifty's disclosures, the only witness Nifty called at the hearing was properly disclosed. Doc. 289. And, if the Moving Defendants are relying on Nifty's discovery responses, the Federal Rules and this Court's Case Management Order provided a mechanism for Moving Defendants to resolve those issues, through a motion to compel. The Moving Defendants did not seek Court intervention on any purported or precise discovery violation, and therefore, the Moving Defendants waived any objections and their motion to reconsider is without merit, just like their original motion in limine. The Motion to Reconsider will be DENIED because there has been no: 1) intervening change in controlling law; (2) new evidence that was unavailable when the court granted the prior motion; or (3) a clear error of law or fact causing manifest injustice. *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

sellers, it also incurs legal expenses and outside assistance. Additionally, lower-price copies decrease the value of Nifty's investments into product development, it has delayed work on new products, and this product line is now being withdrawn from a market in which it had been highly profitable. Additionally, this willful infringement has damaged Plaintiff's relationship with the brick-and-mortar type establishments and has further eroded Nifty's business opportunities.

Although Plaintiff is correct that the expert report of Paul Holmes is part of the record in this case (doc. 219-1), the Court did not admit that evidence at the damages hearing because the expert was not there to testify. The report is uncontroverted, but the Court has not relied upon in it herein.

The Court finds the testimony of Mr. Rose to be credible, and his explanation of the damage it has done to this business is convincing. The infringements have resulted in a winding down of the product line. The record in this case establishes that Defendants and many others like them, who have been sued countless times for these infringements, use this as a business model. The infringing products themselves and the manner in which they are marketed were designed to mislead consumers into believing that they are purchasing Nifty's copyrighted products. Nifty then was required to spend time auditing, reviewing, and trying to remove infringing sellers to the detriment of its own business. As Mr. Rose credibly explained, Nifty incurs "time, money, and effort to optimize its listings to improve [its] sale, and when an infringer comes in and lists [infringing products] at a discounted price, all the work and energy [Nifty puts] in it will be captured by the infringer who has the lowest price point." (Transcript at doc. 280 at 14: 19-23). Mr. Rose provided ample reasons to explain why a small company such as

Nifty's day-to-day and long-term outlook is decimated by the Defendants sale of its infringing products. To that end, Mr. Rose testified that it is being forced to shut down its product line even though it was a very profitable business before the infringements Mr. Rose testified on cross-examination that the profits had gone down from $600,000.00 in 2022 to about $200,000.00-$250,000.00 in 2025. Needless to say, the financial impact of these infringements is tangible and real, and the evidence of the countless times these Defendants have been litigated against for similar infringements, demonstrates that they purposefully adopted this type of activity as a business model. These Chinese-based Defendants have adopted and used illegal business models that fly in the face of the copyright laws of this country.

**III. Conclusions of Law**

Because the parties have chosen not to follow the roadmap of this Court, as set forth by the Court of Appeals in order for Defendants to establish a possible defense, the Court is left with the current posture: default on willful infringement, no development of a possibly meritorious jurisdictional defense, and a new default judgment on liability only.

Since liability has been established, a copyright owner may elect to recover either (1) its actual damages plus any profits of the infringer attributable to the infringement or (2) statutory damages. See 17 U.S.C. § 504(a)(1)–(2). Should a plaintiff seek statutory damages, the Court may award between $750.00 and $30,000.00 per infringement as, in its discretion, it considers "just." Id. § 504(c)(1). If the plaintiff proves willful infringement, the Court, again in its discretion, may increase the statutory damage award up to $150,000.00. Id. § 504(c)(2).

A copyright owner may elect, at any time before final judgment, to seek only an award of statutory damages. 17 U.S.C. Section 504(c)(1). In the case of willful infringement, which has found by this Court and has not been refuted, the Court has the discretion to award statutory damages of up to $150,000.00 per infringement. *See also*, 28 U.S.C. Section 1961.

In addition to serving a compensatory purpose, statutory damages may be awarded as a deterrent to future infringements. *Broadcast Music Inc. v George Moore Enterprises, Inc.* 184 F. Supp.3d 166, 171 (W.D. Pa. April 22, 2016)(citations omitted). In *Broadcast Music*, the Honorable Kim Gibson entered default judgment and awarded $18,700.00 in damages, nearly three times the unpaid licensing fees. The Court considered the licensing fee and evidence of willfulness based upon affidavit, without live testimony.

As the Court in *Broadcast Music* explained: In determining the appropriate award of statutory damages, courts should consider: "(1) expenses saved and profits reaped by the infringer; (2) revenues lost by the plaintiff; (3) the strong public interest in insuring the integrity of the copyright laws; and (4) whether the infringement was willful and knowing or innocent and accidental." Id. "The district court has wide discretion as to the damages actually awarded." *Broad. Music, Inc. v. DeGallo*, Inc., 872 F. Supp. 167, 169 (D.N.J. 1995) (citing *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1984)).

While "statutory damages, as a discretionary remedy, do not demand the same measure of proof as actual damages, they do require Plaintiffs . . . to provide a sufficient evidentiary basis for the Court to reach [a] just result." *Prepared Food Photos, Inc. v. Burch Farms, Inc*., 2026 WL783719 (W.D. Pa. March 19, 2026). While *Burch Farms, Inc*., is instructive as to the proper measure of statutory damages, that case is factually and procedural inapposite in that the

unlawful use was of a thumbnail sized photo located on a subpage of Defendant's website devoted to its Community Supported Agriculture co-op program again. Importantly, that case, unlike the present did not ultimately involve a damages hearing because the case was resolved. Here, all counsel and their respective parties were invited to participate and produce/refute evidence in this matter. The parties were given ample time and notice to attend. They were not ambushed by the other parties, or the Court. They had plenty of opportunity to develop and execute their defenses. They tactically chose not to do so.

This Court is mindful that it has wide discretion in determining the amount of statutory damages. 17 U.S.C. § 504(c)(1); *Broad. Music, Inc. v. Crocodile Rock Corp.*, 634 F. App'x 884, 885 (3d Cir. 2015) ("Courts have wide discretion in determining statutory damages [under 17 U.S.C. § 504(c)]."). "

After consideration of the factors set forth above, the Court finds that factors one, and three and four heavily favor a substantial award of statutory damages. The testimony of Mr. Rose further supports factor number three, albeit of a more general nature. The actions of the Defendants have essentially put the Bacon Bin product line out of business. Therefore, the deterrent value of this award and the need to protect the integrity of copyright laws is of substantial importance. However, exact proof of Plaintiff's lost revenue is not present so those figures do not support a compensatory damages. The credible testimony of Mr. Rose demonstrates enhanced monitoring costs, diverted business effort, price competition for these knockoffs and extreme damage to a previously lucrative business model. Defendants misused all four works (which are embodied in two copyrights listed at doc. 2-5 and doc. 2-6), and did so willfully.

Based upon the record in this case, the Court finds that each of the remaining 32 Defendants knowingly copied Plaintiff's photographs to solicit purchasers, and created ongoing commercial competition, which resulted in the disruption and decimation of its business as Mr. Rose described. Plaintiff seeks the maximum statutory damages of $150,000.00 for each of 4 works for a total of $600,000.00 per Defendant, and cites numerous other recent cases in this Court where the maximum amount of $150,000.00 was awarded (see *Abraham Szomor v. A Canvas Painting*, No. 25cv1696 (W.D. Pa. March 5, 2026); *Lisa Audit v. Herbert Décor*, Case No. 25-cv-1433 (W.D. Pa. Jan. 22, 2026) (doc. 58); *Ian Lusang v. Fenhose*, No. 25-cv-1027 (W.D. Pa. Dec. 18, 2025) (doc. 49); *Lee Ann Shepard v. LUYANZHENLUHENGSHENGBAIHUODIAN*, No. 25-cv-982 (W.D. Pa. Dec. 17, 2025) (doc. 38); *Kelsey McNatt v. Limanjun8868*, No. 25-cv-883 (W.D. Pa. Nov. 25, 2025) (doc. 49); *Jessica Crupi v. Gwndhtbl*, No. 25-cv-902 (W.D. Pa. Nov. 25, 2025) (doc. 45).

The Court, in the exercise of its own discretion, declines that request, however, because the current record does not support the maximum amount of statutory damages. The length of the infringement period was relatively short, and there is no evidence that cease-and-desist letters were sent (the listings were active on June 16-18, 2022, and the TRO was entered on July 13, 2022.) Additionally, Plaintiff failed to produce its expert to testify at the damages hearing. Had the expert come before the Court and testified with more definitive licensing figures, the Court might have been more inclined to award the $150,000.00 per work, as requested by Plaintiff. However, on the current record, that is a bridge too far. The Court will instead award a total of $100,000.00 per work, for each of the four willfully infringed works per Defendant for a total of $400,000.00, in statutory damages, for each of the remaining 32 Defendants.

As a practical matter, as Plaintiff's counsel explained at the hearing on damages, Plaintiff's recovery is probably limited to the amount currently in escrow. For the 20 Defendants represented by Mr. Urbanczyk, the amount of funds that are in Plaintiff's counsel's IOLTA account for those Defendants ranges from zero dollars to a little over $52,000.00 for a grand total of $407,000.00. And, for the 12 Defendants that are represented by Mr. Banister, the smallest amount is $28,000.00, and the highest amount is $340,000.00, which yields a total amount of $1.8 million in the IOLTA escrow account.

An appropriate Order on the permanent injunction/damages/motion to reconsider follows.

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Court Judge

cc: All ECF Counsel of Record